# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ISAAC DA'BOUR DAWSON, | 1:15-cv-01867-DAD-GSA-PC |
| Plaintiff, | **FINDINGS AND RECOMMENDATIONS, RECOMMENDING THAT DEFENDANTS' MOTION TO STRIKE BE DENIED AND DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BE GRANTED** (ECF Nos. 85, 86.) |
| v. | |
| C/O JOHNSON, | |
| C/O GUZMAN, | |
| SERGEANT GONZALES, and | **OBJECTIONS, IF ANY, DUE WITHIN FOURTEEN (14) DAYS** |
| C/O SHELTON, | |
| Defendants. | |

## I.    BACKGROUND

Isaac Da'bour Dawson ("Plaintiff") is a state prisoner proceeding *pro se* and *in forma pauperis* in this civil rights action filed pursuant to 42 U.S.C. § 1983.  This case now proceeds with Plaintiff's initial Complaint filed on December 14, 2015, against defendants Correctional Officer (C/O) Johnson, C/O Guzman, Sergeant Gonzales, and C/O Shelton ("Defendants"), on Plaintiff's Fourth Amendment claims for unreasonable unclothed body searches.  (ECF No. 1.)

On January 29, 2018, the court issued a Discovery and Scheduling Order establishing deadlines for the parties, including a discovery deadline of June 29, 2018, and a dispositive motion filing deadline of August 30, 2018.  (ECF No. 76.)  All of the deadlines have expired.

On November 6, 2017, Plaintiff filed a motion for summary judgment. (ECF No. 64.) On November 27, 2017, Defendants filed an opposition to the motion. (ECF No. 65.) On June 8, 2018, the Magistrate Judge entered findings and recommendations, recommending that Plaintiff's motion for summary judgment be stricken, with leave to file a new motion for summary judgment. (ECF No. 82.) The findings and recommendations are pending. (Id.)

On July 23, 2018, Plaintiff filed a new motion for summary judgment. (ECF No. 84.) On August 3, 2018, Defendants filed a motion to strike Plaintiff's new motion for summary judgment. (ECF No. 85.) Plaintiff has not opposed the motion to strike.

On August 30, 2018, Defendants filed a cross-motion for summary judgment.[1] (ECF No. 86.) On October 17, 2018, Plaintiff filed an opposition to the cross-motion. (ECF No. 92.) On October 19, 2018, Defendants filed a reply to the opposition. (ECF No. 94.)

On October 17, 2018, the Magistrate Judge entered supplemental findings and recommendations, recommending that Plaintiff's first motion for summary judgment be deemed superseded by Plaintiff's second motion for summary judgment, rendering the first motion for summary judgment moot. (ECF No. 90.) The supplemental findings and recommendations are pending. (Id)

Defendants' motion to strike and the parties' cross-motions for summary judgment have been submitted upon the record without oral argument pursuant to Local Rule 230(*l*) and are now before the court.

## II.    MOTION TO STRIKE

On August 3, 2018, Defendants filed a motion to strike Plaintiff's motion for summary judgment filed on July 23, 2018, pursuant to Rule 1 of the Federal Rules of Civil Procedure and the court's inherent powers. (ECF No. 85.)

///

///

---

[1] Concurrently with their motion for summary judgment, Defendants served Plaintiff with the requisite notice of the requirements for opposing the motion. Woods v. Carey, 684 F.3d 934, 939-41 (9th Cir. 2012); Rand v. Rowland, 154 F.3d 952, 960-61 (9th Cir. 1998). (ECF No. 86-1.)

## A. Legal Standards

Rule 1 of the Federal Rules of Civil Procedure (Rules) establishes that the Rules "govern the procedure in all civil actions and proceedings in the United States district courts," with exceptions not applicable here, and "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1. "[A] district court has a duty to administer justice expeditiously and avoid needless burden for the parties." Patrick v. Reynaga, No. 116CV00239LJOJDP, 2018 WL 5304805, at *2 (E.D. Cal. Oct. 24, 2018) (citing See Fed. R. Civ. P. 1; Pagtalunan v. Galaza, 291 F.3d 639, 642 (9th Cir. 2002)).

"It is well established that '[d]istrict courts have inherent power to control their docket.'" Atchison, Topeka & Santa Fe Ry. v. Hercules, Inc., 146 F.3d 1071, 1074 (9th Cir. 1998) (alteration in original) (quoting Hernandez v. City of El Monte, 138 F.3d 393, 398 (9th Cir. 1998)); accord Ready Transp., Inc. v. AAR Mfg., Inc., 627 F.3d 402, 404 (9th Cir. 2010). This includes the power to strike items from the docket as a sanction for litigation conduct. Ibrahim v. U.S. Dep't of Homeland Sec., 835 F.3d 1048, 1065 (9th Cir. 2016) (citing Ready Transp., Inc., 627 F.3d at 404 (9th Cir. 2010).

## B. Defendants' Motion to Strike (ECF No. 85)

Defendants argue that Plaintiff's motion for summary judgment, filed on July 23, 2018, should be stricken from the record because it fails to cite material facts and evidentiary support for Plaintiff's argument and does not set forth any legal authority establishing the elements of Plaintiff's claims or evidence meeting that burden. In support of their motion, Defendants note that on June 6, 2018, the Magistrate Judge recommended that Plaintiff's prior motion for summary judgment filed on November 7, 2017, be stricken from the record because Plaintiff failed to assert sufficient facts supported by evidence to succeed on his claims, and failed to submit a statement of undisputed facts in compliance with Local Rule 260(a) and Rule 56(c) of the Federal Rules of Civil Procedure. (ECF No. 86.) Defendants argue that Plaintiff's motion

///

///

for summary judgment filed on July 23, 2018, should be stricken from the record for the same reasons.

### Discussion

*Pro se* litigants must follow the same rules of procedure that govern other litigants, see King v. Atiyeh, 814 F.2d 565, 567 (9th Cir. 1986), and the court has the power to strike items from the docket as a sanction for litigation conduct, Ibrahim, 835 F.3d at 1065. However, the Ninth Circuit has repeatedly reaffirmed the principal that *pro se* litigants are entitled to leniency, particularly in civil rights cases, which grants Plaintiff latitude. See e.g., Blaisdell v. Frappiea, 729 F.3d 1237, 1241 (9th Cir. 2013) ("Courts in this circuit have an obligation to give a liberal construction to the filings of *pro se* litigants, especially when they are civil rights claims filed by inmates."); Pouncil v. Tilton, 704 F.3d 568, 574–75 (9th Cir. 2012) (construing *pro se* complaints liberally protects the rights of *pro se* litigants to self-representation and meaningful access to the courts, which is particularly important in civil rights cases), cert. denied, —— U.S. ——, 134 S.Ct. 76, 187 L.Ed.2d 30 (2013); Woods v. Carey, 684 F.3d 934, 938–40 (9th Cir. 2012) (recognizing hardships faced by prisoners proceeding *pro se*); Palmer v. Valdez, 560 F.3d 965, (9th Cir. 2009) (recognizing, in affirming the district court's denial of counsel, that the "district court was sensitive to [inmate's] predicament" in trying his civil rights case *pro se*).

Defendants' arguments have merit. Plaintiff's motion for summary judgment is deficient. Plaintiff failed to file a statement of undisputed facts as required by Local Rule 260(a),[2] and he offers no evidence except the allegations in his verified Complaint.[3] However, because Plaintiff is proceeding *pro se* and is a state prisoner challenging his conditions of confinement, he is entitled to leniency as a *pro se* litigant. Therefore, to the extent possible, the

---

[2] Local Rule 260(a) provides that "[e]ach motion for summary judgment or summary adjudication shall be accompanied by a 'Statement of Undisputed Facts' that shall enumerate discretely each of the specific material facts relied upon in support of the motion and cite the particular portions of any pleading, affidavit, deposition, interrogatory answer, admission, or other document relied upon to establish that fact." L.R. 260(a).

[3] Plaintiff's Complaint is verified and his allegations constitute evidence where they are based on his personal knowledge of facts admissible in evidence. Jones v. Blanas, 393 F.3d 918, 922-23 (9th Cir. 2004).

court should endeavor to resolve Plaintiff's motions for summary judgment on their merits. Hernandez, 138 F.3d at 399 (the public policy favoring resolution on the merits "is particularly important in civil rights cases.")  Accordingly, Defendants' motion to strike should be denied, and the parties' cross-motions for summary judgment, including both of Plaintiff's motions for summary judgment, should now be considered on their merits.

## III.    SUMMARY JUDGMENT STANDARD

Any party may move for summary judgment, and the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mut. Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011).  Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1) (quotation marks omitted).  The Court may consider other materials in the record not cited to by the parties, but it is not required to do so. Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

In resolving cross-motions for summary judgment, the court must consider each party's evidence.  Johnson v. Poway Unified School Dist., 658 F.3d 954, 960 (9th Cir. 2011), cert. denied, 132 S.Ct. 1807.  Plaintiff bears the burden of proof at trial, and to prevail on summary judgment, he must affirmatively demonstrate that no reasonable trier of fact could find other than for him.   Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). Defendants do not bear the burden of proof at trial and in moving for summary judgment, they need only prove an absence of evidence to support Plaintiff's case.   In re Oracle Corp. Securities Litigation, 627 F.3d 376, 387 (9th Cir. 2010).

///

///

In judging the evidence at the summary judgment stage, the court may not make credibility determinations or weigh conflicting evidence, <u>Soremekun</u>, 509 F.3d at 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, <u>Comite de Jornaleros de Redondo Beach v. City of Redondo Beach</u>, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted). The court determines only whether there is a genuine issue for trial. <u>Thomas v. Ponder</u>, 611 F.3d 1144, 1150 (9th Cir. 2010) (quotation marks and citations omitted).

Because this court must liberally construe *pro se* pleadings, the arguments and evidence submitted in support of Plaintiff's cross-motions for summary judgment, (ECF Nos. 64, 84), will be considered in tandem with, and as part of, Plaintiff's opposition to Defendant's motion for summary judgment.

In arriving at these findings and recommendations, the court carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties. Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this court did not consider the argument, document, paper, or objection. This court thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate.

## IV.    SUMMARY OF PLAINTIFF'S ALLEGATIONS IN THE COMPLAINT[4]

Plaintiff is a state prisoner presently incarcerated at the California Medical Facility in Vacaville, California. During the events at issue in the Complaint, Plaintiff was incarcerated at Corcoran State Prison in Corcoran, California. A summary of Plaintiff's allegations follows.

On May 17, 2014, Plaintiff was released from his housing unit to morning religious House of Yahweh services. On his way Plaintiff had to use the restroom. While he was waiting

///

---

[4] These allegations summarize only Plaintiff's allegations relevant to the Fourth Amendment claims at issue.

to use the restroom he was called back to his housing unit via the loudspeaker. Plaintiff returned to his housing unit and Defendant C/O Johnson placed him in the shower.

Defendant Johnson ordered him to strip naked and submit to an unclothed body inspection. "Without warning or reason," Plaintiff was instructed to open his buttocks for inspection. ECF No. 1 at 4:11-12. He was then instructed to squat twice and cough. Defendant Johnson told Plaintiff to face him and lift his penis and scrotum. Afterwards, Plaintiff was instructed to report back to his cell. He was never told why he was subjected to a "humiliating body cavity inspection." ECF No. 1 at 4:18-19.

The next day, on May 18, 2014, Plaintiff was again released to religious services. While attending services Plaintiff went to use the restroom twice. Five minutes after his second visit, Defendants C/O Shelton and C/O Guzman interrupted services and told Plaintiff to get up. Plaintiff was then escorted to the yard patio, which was occupied by at least 100 other prisoners, female guards and staff. Defendant Gonzales instructed Defendants Guzman and Shelton to strip search Plaintiff in front of prisoners and female staff. Defendants Guzman and Shelton ordered Plaintiff to remove his clothing while Defendant Gonzales watched. Plaintiff was instructed to spread his buttocks, squat twice and cough, and lift his penis and scrotum. Plaintiff contends that he was humiliated in full view of prisoners and female staff members. Defendants did not provide an explanation to justify the search.

When Plaintiff tried to put his clothing back on, Defendant Guzman told him to put on only his boxers and then walk back to his housing unit. Plaintiff asked that he be allowed to fully dress because he felt humiliated. Defendant Guzman told him no and said that Plaintiff would be written up for failing to follow staff instructions if he did not walk back as instructed. Plaintiff complied and began walking, feeling ashamed and belittled. Plaintiff has a mental health disorder and is a participant in the prison's CCCMS[5] program, and he contends that he did not know how to react or deal with the traumatizing situation. As time went on he became severely depressed and ashamed to leave his cell.

///

---

[5] Correctional Clinical Case Management System.

Based on these facts, Plaintiff alleges violation of the Fourth Amendment by Defendants Johnson, Guzman, Shelton, and Gonzales based on the strip searches.

**V.     FOURTH AMENDMENT CLAIM FOR UNREASONABLE STRIP SEARCH**

The Fourth Amendment guarantees the right of the people to be secure against unreasonable searches, and its protections extend to incarcerated prisoners.  Bell v. Wolfish, 441 U.S. 520, 545, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).  The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application.  Id. at 558. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails.  Id.  The required factors for courts to consider include: (1) "the scope of the particular intrusion," (2) "the manner in which it is conducted," (3) "the justification for initiating it," and (4) "the place in which it is conducted."  Byrd v. Maricopa Cty. Sheriff's Dep't, 629 F.3d 1135, 1141 (9th Cir. 2011) (quoting Bell, 441 U.S. at 559); accord Wallace v. Ducart, No. 17-CV-05488-SI, 2018 WL 348152, at *3 (N.D. Cal. Jan. 10, 2018)

The Fourth Amendment applies to the invasion of bodily privacy in prisons.  Bull v. San Francisco, 595 F.3d 964, 974-75 (9th Cir. 2010) (en banc); Michenfelder v. Sumner, 860 F.2d 328, 333 (9th Cir. 1988).  The reasonableness of a prisoner search is determined by reference to the prison context.  Id. at 332.  "When a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78, 79, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

**VI.     DEFENDANTS' STATEMENT OF UNDISPUTED FACTS**

Defendants submit the following undisputed material facts in support of their motion for summary judgment.  (ECF No. 86-2.)

**(I)     AT THE TIME OF HIS ALLEGATIONS, PLAINTIFF WAS HOUSED AT CORCORAN'S HIGH-SECURITY 3A FACILITY, WHICH HAD A RAMPANT CONTRABAND PROBLEM.**

1.     At the time of Plaintiff Issac Da'Bour Dawson's allegations, in May 2014, the 3A Facility at California State Prison-Corcoran (Corcoran) was a maximum-security facility that housed some of the most dangerous general-population

inmates in the entire CDCR system. (Gonzales Decl. ¶ 2; Johnson Decl. ¶ 2; Kimbrell Decl. ¶ 8.)

2.      California State inmates are classified as Level I, II, III, or IV—with Level I representing minimum security and Level IV representing maximum security—based on a point system that takes into account a number of factors, including the background and behavior of each inmate. (Gonzales Decl. ¶ 2; Cal. Code Regs. tit. 15, § 3375.)

3.      Inmates with a placement score of 60 and above are placed in Level IV facilities, usually based on one or more of the following: (1) long prison sentences, such as 25-years to life, fifty years or more, and life without parole; (2) history of violent behavior and other misconduct in prison; (3) gang-related convictions; and (4) escape risks. (Gonzales Decl. ¶ 3; Johnson Decl. ¶ 2.; Kimbrell Decl. ¶ 12; Cal. Code Regs. tit. 15, §§ 3375.1(a), 3375.3.1)

4.      Because Level IV inmates are a greater security threat than other general-population inmates, these inmates are managed more closely, with more restrictive measures to protect inmates and prison employees. (Gonzales Decl. ¶ 2.)

5.      At the time of Plaintiff's allegations, the 3A Facility was designated "Level IV." (Gonzales Decl. ¶ 3; Johnson Decl. ¶ 2.)

6.      Plaintiff was initially placed in the Level IV facility in October 2012 due to his high point score of 102, which was based on his sentence, criminal history, and the subsequent discipline he received while in county jail and CDCR custody. (Kimbrell Decl. ¶ 11-12.)

7.      Plaintiff remained at the Level IV facility through the time of his allegations in this lawsuit due to his ongoing disciplinary issues and increasing placement score. (Kimbrell Decl. ¶13.)

8.      In addition to the security concerns attendant with any Level IV general population facility, Corcoran's 3A Facility was experiencing a particularly

severe contraband problem during the year-long period up to and including the time of Plaintiff's allegations, in May 2014. (Gonzales Decl. ¶ 4; Shelton Decl. ¶ 2; Guzman Decl. ¶ 2; Johnson Decl. ¶ 2; Kimbrell Decl. ¶ 8.)

9.     Defendants frequently uncovered contraband, sometimes on a weekly basis, throughout the 3A Facility. (Gonzales Decl. ¶¶ 5-7; Shelton Decl. ¶¶ 2-5; Guzman Decl. ¶¶ 3-5; Johnson Decl. ¶¶ 2-4.)

10.    Due to the contraband problem, security concerns at the 3A Facility during the year-long period up to and including the time of Plaintiff's allegations in May 2014 were especially heightened, and correctional staff regularly conducted clothed and unclothed body searches, as well as searches of the yard, cells, and common areas in order to detect and retrieve contraband. (Gonzales Decl. ¶ 4; Shelton Decl. ¶ 2; Guzman Decl. ¶ 2; Johnson Decl. ¶ 2.)

11.    The contraband Defendants uncovered included a wide variety of inmate-manufactured weapons, which could be used to threaten, injure, or kill staff or inmates. (Gonzales Decl. ¶ 5; Shelton Decl. ¶ 3; Guzman Decl. ¶ 3, 4; Johnson Decl. ¶ 3.)

12.    For example, Defendants discovered metal dagger-shaped weapons, ice-pick shaped metal weapons, razor blades melted into toothbrushes, and plastic weapons that had been filed or melted into knives. (Gonzales Decl. ¶ 5; Shelton Decl. ¶ 3; Guzman Decl. ¶ 3; Johnson Decl. ¶ 4.)

13.    Defendants had personally witnessed inmates attack other inmates and their colleagues with such weapons. (Gonzales Decl. ¶ 5; Shelton Decl. ¶ 3; Guzman Decl. ¶ 3; Johnson Decl. ¶ 4.)

14.    Plaintiff testified that he witnessed attacks with inmate-manufactured weapons "all the time." (Miller Decl., ¶ 2, Ex. 1 at 54:12-16.)

15.    In some instances, the brutality of the inmate attacks on correctional officials has resulted in their permanent retirement. (Shelton Decl. ¶ 3; Johnson Decl. ¶ 4.)

16. There was also a high volume of drugs found at the 3A Facility during the year-long period leading up to Plaintiff's allegations. (Gonzales Decl. ¶ 6; Shelton Decl. ¶ 4; Guzman Decl. ¶ 3; Johnson Decl. ¶ 3.)

17. Defendants most frequently uncovered methamphetamine, heroin, and marijuana on the 3A Facility. (Gonzales Decl. ¶ 6; Shelton Decl. ¶ 4; Guzman Decl. ¶ 3; Johnson Decl. ¶ 3.)

18. Plaintiff was found in possession of drug paraphernalia at the 3A Facility just months before the searches alleged in this lawsuit. (Miller Decl., ¶ 2, Ex. 1 at 54:8-11; Kimbrell Decl., ¶ 14, Ex. G.)

19. Drugs and drug paraphernalia could be bartered and sold by inmates, and used for self-harm or to induce or coerce other inmates. (Gonzales Decl. ¶ 6.)

20. During the year-long period leading up to Plaintiff's allegations, Defendants had personally witnessed inmates on the 3A Facility overdose on drugs and act erratically or with violence while intoxicated or high. (Gonzales Decl. ¶ 6; Shelton Decl. ¶ 4; Guzman Decl. ¶ 3; Johnson Decl. ¶ 3.)

21. Contraband cell phones were also particularly rampant at the 3A Facility during the year-long period leading up to Plaintiff's allegations. (Gonzales Decl. ¶ 7; Shelton Decl. ¶ 5; Guzman Decl. ¶ 3; Johnson Decl. ¶ 3.)

22. Cell phones pose a serious security risk because inmates may use them to orchestrate assaults on other inmates, plan contraband drug sales within the prison, order the transfer of drug proceeds in outside accounts, surveille other inmates, carrying out a criminal conspiracy, and do all of the above while avoiding detection by prison officers. (Gonzales Decl. ¶ 7; Shelton Decl. ¶ 5.)

23. During the approximate year-long period leading up to Plaintiff's allegations, Defendants regularly uncovered contraband cell phones on the 3A Facility. (Gonzales Decl. ¶ 7; Shelton Decl. ¶ 5; Guzman Decl. ¶ 3; Johnson Decl. ¶ 3.)

///
///

24. During one seven-month period alone, Officer Johnson either personally uncovered, or observed other officers uncover, approximately sixty-three contraband cell phones on the 3A Facility. (Johnson Decl. ¶ 3.)

25. Defendants also frequently discovered contraband "kites," or communication written in very tiny letters, known as "micro writing," on small pieces or strips of paper. (Guzman Decl. ¶ 4; Gonzales Decl. ¶ 9; Shelton Decl. ¶ 6; Johnson Decl. ¶ 5.)

26. On these kites, inmates fit as many as five handwritten lines within one space of a single line of lined, yellow paper. (Guzman Decl. ¶ 4.)

27. Kites are generally rolled up into very small tubes and covered in something like plastic wrap so that they can be easily concealed on or in an inmate's body or in his clothing. (Guzman Decl. ¶ 4.)

28. Kites pose a security threat because they carry coded, secretive messages, which are passed on up and down the chain of command of prison gangs and often contain directives to carry out acts of violence against inmates of rival gangs or even one's own gang. (Guzman Decl. ¶ 4.)

**(II)  UNCLOTHED BODY SEARCHES WERE NECESSARY TO PREVENT VIOLENCE AND SECURITY BREACHES AT THE 3A FACILITY.**

29. Inmates often hide contraband on their bodies in areas that are not visible over their clothing and can be missed during a routine clothed pat-down search. (Gonzales Decl. ¶ 9; Shelton Decl. ¶ 6; Guzman Decl. ¶ 5; Johnson Decl. ¶ 5.)

30. Most commonly, Defendants have observed inmates on the 3A Facility hiding contraband in their groin area, either tapped [*sic*] to their bodies or hanging from inmate-made satchels, so they could not be easily detected during a clothed pat-down search. (Gonzales Decl. ¶ 9; Shelton Decl. ¶ 6; Guzman Decl. ¶ 5; Johnson Decl. ¶ 5.)

31. Each Defendant has also, on multiple occasions, personally witnessed inmates hiding contraband inside their anal cavities, socks, shoes, and underwear, as well

as inside holes in their clothing, all of which would only be detectable through an unclothed body search. (Gonzales Decl. ¶ 9; Shelton Decl. ¶ 6; Guzman Decl. ¶ 5; Johnson Decl. ¶ 5.)

32. The process for conducting unclothed searches for contraband is as follows: (1) each item of clothing must be removed; (2) a search of each item of clothing is conducted for contraband; (3) the inmate is asked to open his mouth and staff look inside it; (4) the inmate is asked to hold his arms out and wiggle his fingers; (5) staff look behind the inmate's ears; (6) staff inspect around the inmate's scrotum/testicles; (6) staff instruct the inmate to spread his buttocks using his own hands and inspect the rectum area for the absence or presence of contraband or lubricant; (7) staff instruct the inmate to squat and cough; and (8) staff check the bottom of the inmate's feet. (Gonzales Decl. ¶ 8.) This is commonly referred to as a "strip search" or the "squat-and-cough" procedure. (Gonzales Decl. ¶ 8.)

33. The squatting and coughing part of the procedure allows contraband to become dislodged from an inmate's anal cavity. (Gonzales Decl. ¶ 9; Johnson Decl. ¶ 5.)

34. Defendants would conduct an unclothed body search when they suspected an inmate might have obtained contraband. (Gonzales Decl. ¶ 9; Shelton Decl. ¶ 6; Gonzales Decl. ¶ 5; Johnson Decl. ¶ 5.)

35. Defendants have observed inmates attempt to pass contraband directly to one another out of the view of prison staff on the 3A Facility yard, as there could be hundreds of inmates on the yard at one time observed by as few as one or two officers. (Gonzales Decl. ¶ 10; Shelton Decl. ¶ 7; Guzman Decl. ¶ 6; Johnson Decl. ¶ 6.)

36. Inmates also utilize the "drop method," where one inmate hides the contraband at a discrete location on the yard for another inmate to later retrieve. (Gonzales Decl. ¶ 10; Shelton Decl. ¶ 7; Guzman Decl. ¶ 6; Johnson Decl. ¶ 6.)

///

37. Due to inmate "drops," contraband was regularly found hidden in various areas throughout the 3A Facility yard, including the crevices around the pavement, beneath the sprinkler heads, and under the toilet of [a] restroom on the yard. (Johnson Decl. ¶ 6.)

38. Based on state of affairs described in statements 1-37 above, all Defendants agree that an unclothed body search of an inmate would be justified and prudent if the inmate was out walking the 3A Facility yard to and from the restroom, instead of in his assigned religious service. (Gonzales Decl. ¶ 10; Shelton Decl. ¶ 7; Guzman Decl. ¶ 6; Johnson Decl. ¶ 7.)

39. A trip from the chapel to the yard restroom by an inmate assigned to the 3A05 housing unit would raise particular suspicion, because a restroom much closer to the chapel was located in the 3A05 housing unit and would have been available for inmates assigned to the unit to use. (Johnson Decl. ¶ 7; Kimbrell Decl. ¶ 15, Exs. F, G, I; Compl. ¶ 5 [identifying 3A05 as Plaintiff's housing unit].)

**(III)** **PLAINTIFF COMPLAINS OF A PRIVATE, VISUAL-ONLY SEARCH BY OFFICER JOHNSON FOLLOWING AN OPPORTUNITY TO OBTAIN CONTRABAND ON MAY 17, 2014, A DAY THAT OFFICER JOHNSON WAS NOT AT WORK.**

40. Plaintiff alleges that on the morning of May 17, 2017, he was released from his 3A05 housing unit on the 3A Facility for the purpose of attending a Yahweh religious service. (Compl., ECF No. 1 at ¶ 5.)

41. Plaintiff testified that sometime between 9 a.m. and 10:30 a.m., he left the chapel to use the restroom. (Miller Decl., ¶ 2, Ex. 1 at 36:7-38:3.)

42. Plaintiff testified that between the chapel and the restroom there was: "the grass area where people play handball, sit on the grass. Then you got the track where people run laps and… that's in the middle of the grass. There's a grass area where people play soccer or toss the football, whatever. Then the basketball court right, then [there's] the restroom." (Miller Decl., ¶ 2, Ex. 1 at 38:24-39:7.)

///

43. Plaintiff testified he crossed this entire area to get to the restroom. (Miller Decl., ¶ 2, Ex. 1 at 39:8-10.)

44. The distance from 3A Facility chapel to the restroom on the yard is approximately 315 feet. (Kimbrell Decl. ¶ 15, Exs. G, I.)

45. Plaintiff testified that he arrived at the restroom, waited in line behind several other inmates, and then used the restroom. (Miller Decl., ¶ 2, Ex. 1 at 42:3-25.)

46. Plaintiff testified that while he was at the restroom, he heard an officer state over the prison intercom, "Dawson return to your building." (Miller Decl., ¶ 2, Ex. 1 at 39:11-16.)

47. Instead of returning to his building, Plaintiff testified that he walked to the watch tower area and asked Officer Guzman why he needed to return to his building. (Miller Decl., ¶ 2, Ex. 1 at 39:17-39:25.)

48. Plaintiff testified that Officer Guzman responded that he should follow the instruction given by the officer on the intercom. (Miller Decl., ¶ 2, Ex. 1 at 40:2-16.)

49. Plaintiff alleges he then returned to his housing unit, where Officer Johnson instructed him to go to the shower for an unclothed body search. (Miller Decl., ¶ 2, Ex. 1 at 40:18-41:4.)

50. Plaintiff testified that the visual search consisted of Plaintiff taking his clothes off, running his fingers through his hair, putting his hands in his mouth and show[ing] his tongue and cheeks to show he was not hiding something, and bending over and squatting and coughing. (Miller Decl., ¶ 2, Ex. 1 at 44:13-45:6.)

51. Plaintiff testified that the shower where the search occurred was "a secluded area" and that only one other correctional officer, a male, was present. (Miller Decl., ¶ 2, Ex. 1 at 41:17-42:2.)

///
///

52. Officer Johnson did not conduct the search Plaintiff alleges to have occurred on May 17, 2014, because he was not working that day. (Johnson Decl. ¶ 6; Kimbrell Decl. ¶ 4, Ex. A.)

53. Even if Officer Johnson was working on May 17, 2014, Officer Johnson believes the search described by Plaintiff would have been justified given the opportunity Plaintiff had to obtain contraband while out on the 3A Facility yard, where Johnson has personally uncovered contraband. (Johnson Decl. ¶ 6.)

54. Officer Johnson believes the conduct described by Plaintiff—leaving his assigned area and using the restroom on the yard—would have been suspicious, given that a much closer restroom was located in Plaintiff's housing unit and would have been available to him. (Johnson Decl. ¶ 7.)

**(IV)  PLAINTIFF COMPLAINS OF A SEARCH THAT OCCURRED ON MAY 18, 2014, AFTER HE LEFT HIS RELIGIOUS SERVICE TWICE WITHIN TWENTY MINUTES.**

55. Plaintiff testified that after the 9 a.m. House of Yahweh service began on the following day, May 18, 2014, he again left the chapel to use the restroom on the yard. (Miller Decl., ¶ 2, Ex. 1 at 48:15-49:3.)

56. Plaintiff testified that he used the same restroom on the yard as the day before, crossing the grass area, the track, soccer field, and the basketball court where other inmates were present. (Miller Decl., ¶ 2, Ex. 1 at 48:25-49:3, 49:15-21, 38:24-39:10.)

57. Plaintiff testified that he then used the restroom. (Miller Decl., ¶ 2, Ex. 1 at 48:23-49:1.)

58. Plaintiff testified that he then returned to the religious service, after approximately five minutes. (Miller Decl., ¶ 2, Ex. 1 at 49:5-8.)

59. Plaintiff testified that fifteen minutes after he returned to the chapel, he left to use the same restroom again. (Miller Decl., ¶ 2, Ex. 1 at 50:4-6, 50:18-23.)

60. Plaintiff testified that when he arrived at the restroom on the second trip, there was [a] line of inmates waiting at the restroom. (Miller Decl., ¶ 2, Ex. 1 at 50:6.)

61. Plaintiff testified that after he waited in the line and used the restroom, he made his way back to the religious service approximately ten to twenty minutes later. (Miller Decl., ¶ 2, Ex. 1 at 50:6-8, 50:24-51:11.)

62. Plaintiff testified that, five minutes after his return from the second restroom trip, Defendants called Plaintiff to the patio outside of chapel and instructed him to strip out. (Miller Decl., ¶ 2, Ex. 1 at 51:13-21.)

63. Plaintiff testified that Sergeant Gonzales initiated the search and authorized Officers Guzman and Shelton to carry it out. (Miller Decl., ¶ 2, Ex. 1 at 55:5-56:5.)

64. Plaintiff testified the visual search was conducted in the same manner as the previous alleged search by Officer Johnson, i.e. Plaintiff ran his hands through is hair, the officers check his mouth, and he lifted his scrotum and squatted and coughed. (Miller Decl., ¶ 2, Ex. 1 at 52:19-53:1.)

65. Plaintiff testified the entire process took 10 to 15 minutes' total, as he was arguing with the officers "for a while" before allowing the search to proceed. (Miller Decl., ¶ 2, Ex. 1 at 56:15-16; 62:3-14.)

66. Plaintiff testified that, during this time, two female correctional staff—Officers Gamboa and Casa—could view the search. (Miller Decl., ¶ 2, Ex. 1 at 68:6-19.)

67. Officer Casa was not working on May 18, 2014. (Kimbrell Decl. ¶ 5, Ex. B; Gamboa Decl. ¶ 2.)

68. Officer Gamboa, who Plaintiff alleges was "a door and that" away from where Plaintiff was allegedly searched, does not recall observing the alleged search. (Miller Decl., ¶ 2, Ex. 1 at 70:9-13; Gamboa Decl. ¶ 3.)

69. Plaintiff testified that he saw unidentified female nurses come out on the patio during the search. (Miller Decl., ¶ 2, Ex. 1 at 52:1-2.)

70. There were only two nurses working at the 3A Facility on May 18, 2014, and neither were female. Kimbrell Decl. ¶ 6, Ex. C.)

71.  Plaintiff testified the search was in view of up to 150 other inmates [who were] on the yard near 3A Facility Buildings 1 and 2. (Miller Decl., ¶ 2, Ex. 1 at 65:3-6, 65:17-23; ECF No. 1 at ¶ 6.)

72.  3A Facility housing units 3A01 and 3A02, commonly referred to on the 3A Facility as "Buildings 1 and 2," are located across the yard—approximately 600 feet—away from the patio area in front of the Chapel, which is located in 308A, where Plaintiff alleges the search took place. (Kimbrell Decl. ¶ 15, Exs. H, I.)

73.  Plaintiff testified that up to four inmates in the chapel might have seen the search through a window. (Miller Decl., ¶ 2, Ex. 1 at 71:20-73:6.)

74.  Plaintiff testified that "a few" inmates working on the patio saw the search. (Miller Decl., ¶ 2, Ex. 1 at 70:19-71:2.)

75.  All the inmates at the 3A Facility on May 18, 2018 were male. (Gonzales Decl. ¶ 2).

76.  Sergeant Gonzales and Officers Guzman and Shelton did not conduct the unclothed body search Plaintiff complains of. (Gonzales Decl. ¶ 11; Guzman Decl. ¶ 7; Shelton Decl. ¶ 8.)

77.  Sergeant Gonzales and Officers Guzman and Shelton each believe the conduct Plaintiff describes—leaving his religious service twice within twenty minutes—would have been suspicious and justified an unclothed body search, given the opportunity he would have had to obtain contraband on the maximum-security yard experiencing a significant contraband problem. (Gonzales Decl. ¶ 10; Guzman Decl. ¶ 6; Shelton Decl. ¶ 8.)

## VII.  DEFENDANTS' ARGUMENTS

Defendants argue that (1) the undisputed facts establish that Officer Johnson is entitled to summary judgment on Plaintiff's Fourth Amendment claim; (2) the undisputed facts establish that Sergeant Gonzales and Officers Guzman and Shelton are entitled to summary judgment on Plaintiff's Fourth Amendment claim; and (3) at minimum, Defendants are entitled

///

to qualified immunity because there is no Supreme Court, Ninth Circuit, or consensus case law establishing that their alleged conduct was unlawful under the circumstances.

Defendants' evidence includes Plaintiff's allegations in the Complaint; the declarations of Sergeant H. Gamboa, defendant Lieutenant J. Gonzales, defendant C/O A. Guzman, defendant C/O B. Johnson, Litigation Coordinator M. Kimbrell, Deputy Attorney General Byron Miller, and defendant C/O D. Shelton; prison records; and excerpts from Plaintiff's deposition.

### A.  Officer Johnson is Entitled to Summary Judgment

Defendants argue that CDCR's official records establish that defendant C/O Johnson did not conduct, and could not have conducted the search alleged by Plaintiff because he was not working on the day of the alleged search.  Defendants provide a copy of Corcoran's 3A Facility FLSA attendance Sign-In Sheet for Second Watch (6 a.m. to 2 p.m.) custody staff on Saturday, May 17, 2014, showing that defendant Johnson was not working during this time.  Thus, Defendants argue that summary judgment should be granted in defendant Johnson's favor because the causation element of Plaintiff's unlawful search claim is entirely absent.

Assuming, *arguendo*, that the alleged search did occur as Plaintiff alleges, Defendants argue that each <u>Bell</u> factor supports summary judgment in defendant Johnson's favor.  In his deposition, Plaintiff described the search as visual only, with no touching. The search occurred in a shower, a relatively secluded area where inmates were regularly unclothed, and was outside the view of other inmates and all but one other male staff member.  The search was conducted by a male officer and was consistent with the standard procedures for an unclothed body search of any inmate -- running hands through hair, checking the inside of the mouth, viewing around the scrotum, and squatting and coughing.  And the search had to be unclothed in order to uncover creatively hidden contraband that could otherwise be missed during a standard  pat-down search.

Defendants argue that the search would have been justified by compelling penological concerns because Plaintiff had the opportunity to obtain contraband and a weapon while outside his cell.  Plaintiff alleges he was released from his housing unit for the purpose of

attending a religious service. But shortly thereafter, Plaintiff alleges leaving the chapel; crossing the grassed handball area, running track, football area, and the basketball court -- approximately 300 feet -- to the restroom on the yard; waiting in a line of inmates at the restroom; and eventually using the restroom on the yard, at which time he was called back to his housing unit. Considering the quantities of contraband that were regularly found throughout the 3A Facility, including the very restroom Plaintiff allegedly used, Plaintiff's impromptu hiatus would have presented a clear opportunity to obtain contraband and a weapon while outside of his cell and therefore provided a legitimate basis for defendant Johnson's visual strip search. This is especially true, considering the maximum-security 3A Facility's rampant contraband problem was causing significant safety and security problems, including violent attacks on inmates and staff, during this time period. And the search would have been further justified based on the suspicions raised by the fact that there was a much closer restroom located in Plaintiff's housing unit that would have been available for him to use.

**B.**    **Sergeant Gonzales, C/O Guzman, and C/O Shelton are Entitled to Summary Judgment**

Defendants argue that the search on May 18, 2018, if it happened, would have been justified under factors established in Bell.[6] According to Defendants, the scope and manner of the alleged search were appropriate. The alleged search was visual only; the officers did not touch Plaintiff. The alleged search was conducted by male officers and consisted of the standard techniques for unclothed body searches. The unclothed nature of the search would have been necessary to uncover contraband that, in Defendants' collective experience, was commonly concealed around inmates' genitals, and inside their anal cavities, socks, shoes, underwear, and clothes.

As with the alleged search by defendant Johnson, the penological justification described by Sergeant Gonzales and Officers Guzman and Shelton would have been compelling in light of the state of affairs at the 3A Facility. Defendants were in the midst of combating a particularly severe contraband problem on 3A Facility, which housed inmates like Plaintiff,

---

[6] Bell v. Wolfish, 441 U.S. 520 (1979).

deemed the highest security risk at the institution. Contraband, drugs, weapons, cell phones, and kites were all commonplace at the 3A Facility, including the facility's exercise yard. The contraband was posing a serious and indisputable threat to the security of the 3A Facility. One of Defendants' central tools to control the influx or contraband was the unclothed body search because it revealed drugs hidden in a variety of manners -- generally close to the inmates' genitals -- that could not be otherwise detected. If, on these facts, Defendants had discovered that an inmate had left his assigned religious service twice within a twenty-minute time period, both times passing up the closer restroom at his assigned housing unit, to use another restroom across the prison yard where contraband was regularly uncovered, an unclothed body search of that inmate would be fully justified.

Defendants argue that the alleged place of the search -- on the prison yard in view of other inmates and staff -- does not undermine the legitimacy of the search or outweigh the impetus of the other <u>Bell</u> factors. That a handful of prisoners on the 3A Facility patio or in the chapel might have seen the alleged search, would not render it unconstitutional. Assuming the alleged search may have also been visible by a number or other prisoners hundreds of feet away, the view could not have been clear. In any event, the Ninth Circuit in <u>Thompson</u>[7] rejected the argument that strip searches must be conducted "out of view of the other prisoners."

Plaintiff alleges that unidentified female nurses and two correctional officers could see the search, but CDCR official records show that neither of the two nurses working at the 3A Facility on the alleged date and time were female. The only female officer who was working does not recall observing the alleged search and was not in position to observe it. Even assuming that the search was viewable by up to four female employees, Defendants argue that Plaintiff cannot show a constitutional violation, because under <u>Michenfelder</u>,[8] the assignment of female staff to positions requiring "only infrequent and casual observation, or observation at

---

[7] <u>Thompson v. Souza</u>, 111 F.3d 694, 701 (9th Cir. 1997).

[8] <u>Michenfelder</u>, 860 F.2d at 33-34.

a distance, and that are reasonably related to prison needs are not so degrading to warrant court interference."

Defendants argue that the Byrd case lends no support to Plaintiff's claim even though Byrd concluded that the cross-gender aspect of a search by jail officials was unconstitutional, because the facts of this case are distinguishable. The Byrd plaintiff was a pretrial detainee (rather than a maximum-security convicted felon) who was physically searched (rather than observed) by a female cadet (rather than officer) who touched his genitals, while at least one person videotaped the search and a multitude of male officers -- who could have performed the search instead -- stood by watching. Byrd, 629 F.3d at 1136-37.

In sum, Defendants argue that assuming the May 18, 2014 search occurred, the undisputed facts establish that it would have been a precautionary measure that was justified under the circumstances, rather than a violation of Plaintiff's Fourth Amendment rights. Thus, Defendants argue that Plaintiff's Fourth Amendment claim against Sergeant Gonzales and Officers Guzman and Sheldon fails as a matter of law and summary judgment should be granted in their favor.

### C.    Defendants' Burden

The court finds that Defendants have met their burden of demonstrating that they did not violate Plaintiff's Fourth Amendment rights to be free from unreasonable unclothed body searches. The burden shifts to Plaintiff to produce evidence of a genuine disputed fact that would affect the final determination in this case.

## VIII.  PLAINTIFF'S OPPOSITION AND CROSS-MOTIONS

On October 17, 2018, Plaintiff submitted a two-page opposition to Defendants' motion for summary judgment titled "Motion: Asking the Court to Dismiss the Defendants' Summary Judgment," stating in its entirety:

> Plaintiff Issac Da'bour Dawson is an inmate housed at CSP-Sac and want[s] the Defendants to provide a plaintiff with a copy of Defendant Johnson's overtime work log of May 2014 as w[ell] as a copy of his regular work hou[r]s of May 2014 to show that Defendant Johnson worked on the [days] that the Plaintiff had the two incidents he says happened because the Defendants first state that they did nothing to the Plaintiff but then they say that even if they did they had the

ri[ght] to do so because the yard is full of drugs. But once I asked why am I being stripped-searched and you refuse to tell me why I am being strip[] searched. And you force me to do thing[s] that are not in a proper search not legal search in front of other inmates, C/O's and free staff male or female. You violate the Plaintiff's 4th Amendment [rights] and when you['re] forced to spread you[r] but[t] wide open in broad daylight in front of people's view that is cruel and unusual punishment, [which] is an 8th Amendment violation. So the Plaintiff is asking for the courts to turn over all documents that the Plaintiff is asking for, because if the Plaintiff was not able to get these documents on its own, then wouldn't it be a reprisal to withhold these things to the Plaintiff.

(ECF No. 92.) Plaintiff's opposition offers no evidence in the form of declarations, depositions, answers to interrogatories, authenticated documents, or other materials, despite the fact that Plaintiff was warned in Defendants' Rand Warning that he must set out specific facts supported by evidence, contradicting the facts shown by Defendants and showing that there is a genuine issue of material fact for trial. (ECF No. 86-1.) Plaintiff was also informed in the Rand Warning that under Local Rule 260(b), he was required to respond to each of the facts in Defendants' Statement of Undisputed Facts, but Plaintiff has not done so.

Plaintiff's opposition requests the court to compel Defendants to provide copies of defendant Johnson's work schedule in May 2014, to show that Defendant Johnson worked on the days that Plaintiff alleges the two strip searches at issue occurred. It is inappropriate for Plaintiff to bring a motion to compel at this stage of the proceedings. The deadline in this case for completion of discovery, including the filing of motions to compel, expired on June 29, 2018. (ECF No. 46.) Even so, Defendants' motion for summary judgment provides a copy of Corcoran's 3A Facility FLSA attendance Sign-In Sheet for Second Watch (6 a.m. to 2 p.m.) custody staff on Saturday, May 2014, showing that defendant Johnson was not working during this time. (Kimbrell Decl., ECF No. 86-8 ¶ 4, Ex. A.)

Plaintiff first motion for summary judgment, (ECF No. 64), filed on November 6, 2017, recites allegations from the Complaint describing the events at issue allegedly occurring on May 17, 2014 and May 18, 2015, when he was subjected to unclothed body searches by Defendants. Plaintiff also discusses the reasons he did not file his 602 prison appeal log #14-3632 until June 9, 2014.

///

Plaintiff's second motion for summary judgment, (ECF No. 84), filed on July 23, 2018, states in its entirety:

> Plaintiff has filed objections on the defendants' motion to have Plaintiff's summary judgment stricken but never got a response. So the Plaintiff has been forced to re-write his summary judgment motion. As to why the Plaintiff's motion should be granted[, it is] because when the Plaintiff wrote his first summary judgment it explained the Plaintiff's claims, and the Defendants openly admit fault but try to cover it up. When the defendants' attorney asked [whether] the Plaintiff [had] any witnesses, the Plaintiff provided the attorney with a list of names and gave a full statement on the [events] that had [occurred] while housed at Corcoran's 3A yard, on record, and the motions from the Defendants' prior statements [are] in conflict with what they say happened to the Plaintiff on those [two] days. So this is why the Plaintiff push for his summary judgment to be granted this time.

Both of Plaintiff's motions for summary judgment are deficient. Plaintiff failed to file any statement of undisputed facts as required by Local Rule 260(a),[9] and he offers no evidence except the allegations in his verified Complaint. Therefore, Plaintiff's evidence consists of only the verified allegations in his original Complaint and any evidence in his two motions for summary judgment. (ECF Nos. 1, 64, 84.)

## IX. ANALYSIS

The court has reviewed Plaintiff's two motions for summary judgment, Plaintiff's opposition to Defendants' motion for summary judgment, and Plaintiff's evidence and finds, for the reasons that follow, that Plaintiff has not produced admissible evidence of any genuine and material disputed fact to be decided at trial.

### A. The May 17, 2014 Unclothed Body Search -- defendant Johnson

#### 1. Causation

"Causation is, of course, a required element of a § 1983 claim." Estate of Brooks ex rel. Brooks v. United States, 197 F.3d 1245, 1248 (9th Cir. 1999), as amended (Dec. 9, 1999) (citing Oviatt v. Pearce, 954 F.2d 1470, 1474 (9th Cir. 1992)). The [§] 1983 statute plainly

---

[9] Local Rule 260(a) provides that "[e]ach motion for summary judgment or summary adjudication shall be accompanied by a 'Statement of Undisputed Facts' that shall enumerate discretely each of the specific material facts relied upon in support of the motion and cite the particular portions of any pleading, affidavit, deposition, interrogatory answer, admission, or other document relied upon to establish that fact." L.R. 260(a).

requires that there be a link, or causal connection, between each defendant's actions or omissions and a violation of the plaintiff's federal rights. <u>Lemire v. California Dep't of Corr. and Rehab.</u>, 726 F.3d 1062, 1074–75 (9th Cir. 2013); <u>Starr v. Baca</u>, 652 F.3d 1202, 1205–08 (9th Cir. 2011). Under section 1983, a plaintiff must demonstrate that each defendant *personally* participated in the deprivation of his or her rights. <u>Jones v. Williams</u>, 297 F.3d 930, 934 (9th Cir. 2002) (emphasis added).

Defendants argue that Defendant Johnson could not have caused the alleged violation of Plaintiff's rights because he was not at work on May 17, 2014. Defendant Johnson declares:

> I understand that Plaintiff alleges that I performed an unclothed body search of him in the shower area of his housing unit on May 17, 2014, after he left his assigned morning religious service to use the restroom located on the 3A Facility yard. I did not conduct the alleged search because I was not at work on May 17, 2014.

(Johnson Decl. ECF No. 86-7 at 2 ¶ 6.)

Plaintiff alleges that on May 17, 2014, defendant C/O Johnson placed him in the shower and subjected him to an unclothed body search.

> On May 17, 2014, . . Plaintiff was placed in the lower C-section shower by Correctional Office Johnson. He was then commanded by Guard Johnson to strip naked for an unclothed body inspection.

(Complaint, ECF No. 1 at 4 ¶ 5.)

The differences in the parties' evidence raise a genuine issue of material fact whether Defendant Johnson subjected Plaintiff to the strip search at issue on May 17, 2014. However, Defendants argue that even if the search occurred as Plaintiff alleges, each <u>Bell</u> factor supports summary judgment in defendant Johnson's favor.

### 2. <u>Place, Scope, and Manner of the Search</u>

Defendants provide evidence that the search described by Plaintiff was not unreasonable in its scope, manner, or place conducted, because the search was visual only and was not intrusive, and the place where it was conducted was a secluded area.

In <u>Bell</u>, 441 U.S. 520, the Supreme Court set forth a balancing test to analyze whether searches of detainees violated the Fourth Amendment. In that case, pretrial detainees at a federal correctional facility argued that a policy requiring them to expose their body cavities for

visual inspection as part of a strip search conducted after every contact visit with a person from outside the institution violated their Fourth Amendment rights. <u>Id.</u> at 558. The visual inspection required male prisoners to lift their genitals and spread their buttocks, and female prisoners to expose their vaginal and anal cavities. <u>Id.</u> at 558 n. 39. Jail officials did not touch the prisoners during the visual inspection. <u>Id.</u> "Corrections officials testified that visual cavity searches were necessary not only to discover but also to deter the smuggling of weapons, drugs, and other contraband into the institution." <u>Id.</u> "Balancing the significant and legitimate security interests of the institution against the privacy interests of the prisoners," the Court held that the visual body cavity searches were reasonable, and did not violate the Fourth Amendment. <u>Id.</u> at 558-560. The Court explained:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted. A detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence. And prisoner attempts to secrete these items into the facility by concealing them in body cavities are documented in this record [ ] and in other cases.

<u>Id.</u> at 559 (internal citations omitted).

The visual inspection described by Plaintiff in the present case is no more intrusive than the visual inspection found reasonable under the Fourth Amendment in <u>Bell</u>. Plaintiff alleged in the Complaint that:

> Plaintiff returned back to his housing unit and was placed in the lower C-section shower by Correctional Officer Johnson. He was then commanded by Guard Johnson to strip naked for an unclothed body inspection. Without warning or reason Plaintiff was instructed by Johnson to open his buttocks wide for inspection of his anal/rectum area. He was then instructed to squat twice and cough. Johnson then had Plaintiff face him and instructed Plaintiff to lift up his penis and scrotum for inspection. Afterwards, Plaintiff was instructed to report back to his assigned cell.

(Complaint, ECF No. 1 at 4:8-17.)

Plaintiff testified at his deposition:

Q.     So you said it was in the bathroom?

A.     No, the shower.

Q.	In the shower?

A.	Yeah, lower C Section shower.

Q.	In the lower C Section shower, was there anyone else in there?

A.	I mean there was -- I mean the other C/O kn[ew], and he was right there, but like I say, I'm in a secluded area. I have no jurisdiction to argue with you, fight you, I'm in a secluded -- from what I was told they're allowed to do that.

(Depo., ECF No. 86-9 at 14-15; 41:17-42:2.)

Q.	So ask you describe the search. You said squat and cough?

A.	Yeah, squat and cough.

Q.	So you take your clothes off?

A.	Yes, sir.

Q.	Then what happens?

A.	After I take my clothes off, run my fingers through my hair. He makes me run my fingers through my hair, lift, put my hands in my mouth and show my tongue and cheeks and show I'm not hiding nothing. Then he says, "You lift up your scrotum." I lift up my scrotum, he gets to looking, trying to get close, he moves back. "Man, you're a big dude." "Why are you trying to get look at my stuff like that?" Then I turn around. He said -- he asked me to run around and squat and cough. So I turn around, I squat and cough. He said, "No, bend over by the waist and squat and cough."

(Depo., ECF No. 86-9 at 17-18; 44:13-45:6.)

Thus, Plaintiff testified that the search was visual only, with no touching, occurred in an indoor shower, a relatively secluded area where inmates were regularly unclothed, and was outside the view of other inmates and all but one other male staff member. Plaintiff also testified that the search was conducted by a male officer and was consistent with the standard procedures for an unclothed body search of any inmate -- running hands through hair, checking the inside of the mouth, viewing around the scrotum, and squatting and coughing.

### 3.	**Justification**

Plaintiff states that he was never given an explanation or reason why he was subjected to such a humiliating body cavity inspection. (Complaint, ECF No. 1 at 4:17-18.) Defendants argue that the search would have been justified by compelling penological concerns because

Plaintiff had the opportunity to obtain contraband and a weapon while outside his cell, the facility where Plaintiff was housed was a maximum security facility that was dangerous and required close management, contraband and drugs were regularly found throughout the facility, including the very restroom Plaintiff used, and it was suspicious that Plaintiff left his assigned religious service at the chapel to use the restroom located on the 3A Facility yard, because there was a much closer restroom available.

As declared by defendant Johnson:

> It would have been particularly suspicious for Plaintiff to leave his assigned religious service at the chapel to use the restroom located on the 3A Facility yard, because a much closer restroom to the chapel was located in his housing unit (3A05) and would have been available for him and other inmates assigned to the unit to use.

(Johnson Decl., ECF No. 86-7 ¶ 7.)

In the Complaint, Plaintiff alleges he was "released from his housing unit 3A-05 for morning religious House of Yahweh services." (Compl., ECF No. 1 at ¶ 5.) Defendants assert that Plaintiff testified that shortly thereafter he left the chapel to go to the restroom, crossing the grassed handball area, running track, football area, and the basketball court -- approximately 300 feet -- to the restroom on the yard; waiting in a line of inmates at the restroom; and eventually using the restroom on the yard, at which time he was called back to his housing unit. Plaintiff described his conduct in his deposition:

> Q.   So you went to the restroom. Was there anything in between the chapel and the restroom?
>
> A.   We got the grass area where people play handball, sit on the grass. Then you got the track where people run laps and like that that's in the middle of the grass. There's a grass area where people play soccer or toss the football, whatever. Then the basketball court right, then here's the restroom.
>
> Q.   So you had to cross the grass, the track, the basketball courts and then the restroom?
>
> A.   Yeah.
>
> Q.   Okay. And you get to the restroom, and you're at the restroom, that's when you hear the intercom?
>
> A.   Yes.

Q.    What did it say?

A.    "Dawson return back to your building." I asked Guzman, "Why do I got to go back to my building?"

Q.    Who did you ask that to?

A.    Guzman, C/O Guzman.

Q.    He was at the restroom?

A.    No, I walked back. I walked out to the tower, "Why I gotta go back?"

Q.    So you walked to the housing unit?

A.    No, I walked to the tower.

Q.    The tower, where is the tower?

A.    I didn't walk directly to the tower, but I walked to where -- here's my medical gate, a little gate where people go get their gates [*sic*]. Then there's the COC, the little tarp thing, the tower right up here. Guzman I said, "Guzman, why they saying I gotta go back to the building, man? You seen me go back to the restroom." He said, "Go back to your --"

Q.    So Guzman said to you you heard what he asked?

A.    Yeah.

Q.    Go back to the building. When he said you heard what he asked, who was "he"?

A.    I don't even know who the person in the tower was. They just told me to go back to the building. So I don't want to get to confrontation with them, so I went back to the building.

(Depo., ECF No. 86-9 at 11-13; 38:24-40:18.)

     The 3A Facility where Plaintiff was housed was a maximum-security facility that was dangerous and required close management. Defendant Gonzales described the facility as:

     an all-male Level IV maximum-security facility that housed the most dangerous general-population inmates in the entire CDCR system. State inmates are classified as level I, II, III, or IV, based on a point system, which takes into account a number of factors, including the background and behavior of each inmate. See Cal. Code Regs. tit. 15, § 3375. Level I is minimum security, and level IV represents maximum security. Because Level IV inmates are a greater security threat than other general-population inmates, Level IV facilities like 3A are managed more closely, with more restrictive measures to protect inmates and prison employees.

(Gonzales Decl. ¶ 2.)

///

29

Contraband was regularly found throughout the 3A Facility, including the very restroom Plaintiff used. Defendant Gonzales declared:

> From around May 2013 through the time of Plaintiff's allegations, I regularly uncovered numerous types of contraband weapons on the 3A Facility, which were made by inmates from materials found on the prison grounds. These inmate-manufactured weapons included metal dagger-shaped weapons, ice-pick shaped metal weapons, and plastic weapons that had been melted and shaped into knives. During this time-period, I had also personally witnessed inmates attack my colleagues and other inmates with such weapons. Many staff attacks come from inmates affiliated with prison gangs who, when searched by staff, are under instructions from gang leaders to either attack the staff member conducting the search or run away and attempt to destroy or dispose of the contraband they are carrying.

(Gonzales Decl., ECF No. 86-5 ¶ 5.)

Plaintiff testified that inmates sometimes attack other inmates with weapon contraband and that he has been found with contraband.

> Q.     Have you ever been found with contraband?
>
> A.     Yeah, I have. I've been - - they found a syringe in the cell. I mean since, you know, I'm a lifer, so it's my --
>
> Q.     Have you ever been attacked by another inmate with weapon type contraband?
>
> A.     No.
>
> Q.     Have you heard of these attacks?
>
> A.     Yeah, you see them in the yard all the time.

(Depo., ECF No. 86-9 at 25; 54:8-16.)

Defendants provide their declarations asserting that drugs, cellphones, and "kites" were regularly uncovered on the 3A Facility. Defendant Guzman declared:

> During the time period leading up to Plaintiff's allegations, from around May 2013 through May 2014, I regularly discovered contraband "kites," or communications written in very tiny letters, known as "micro writing," on small pieces or strips of paper. On these kites, I have observed as many as five handwritten lines fitting within one space of a single line of lined, yellow paper. Kites are generally rolled up into very small tubes and covered in something like plastic wrap so that they can be concealed on an inmate's body or in his clothing. I have observed coded, secretive messages carried on kites, which are passed on up and down the chain of command of prison gangs and often contain directives to carry out acts of violence against inmates of rival gangs and even members of one's own gang.

(Guzman Decl., ECF 86-6 ¶ 4.)

Based on the foregoing, the court finds that the May 17, 2014 strip search as described by Plaintiff was not unreasonable under the Fourth Amendment. It is undisputed that a visual search for contraband is a legitimate penological interest. Thompson, 111 F.3d at 700 (citing Michenfelder, 860 F.2d at 332, citing Bell, 441 U.S. at 558–60.) It is also undisputed that the May 17, 2014 search described by Plaintiff, allegedly conducted by defendant Johnson, was visual, not physical, and there are no allegations to support a finding that the search was excessive, vindictive or harassing. There is no assertion that the search extended beyond a visual cavity search or that Defendants sought to extend the search longer than necessary. Moreover, it is undisputed that the search took place in the lower C Section shower, described by Plaintiff as a secluded area where only one male officer besides defendant Johnson was present.

**B.**      **The May 18, 2014 Unclothed Body Search -- defendants Shelton, Guzman, and Gonzales**

     **1.**      **Causation**

As discussed above, "[c]ausation is, of course, a required element of a § 1983 claim." Estate of Brooks ex rel. Brooks, 197 F.3d at 1248, as amended (citing Oviatt 954 F.2d at 1474).

Defendants deny that the search on May 18, 2018, described by Plaintiff in the Complaint, (DUF Nos. 55-59; Miller Decl. ¶ 2, Ex. 1 at 38:24-39:10, 48:15-49:3, 49:5-8, 49:15-21, 50:4-6, 50:18-23.), occurred at all, (DUF No. 76; Gonzales Decl. ¶ 11; Guzman Decl. ¶7; Shelton Decl. ¶ 8.), but that such a search would have been justified.

     **2.**      **Place, Scope, and Manner of the Search**

Plaintiff testified in his deposition about the May 18, 2018 search:

Q.      Can you describe the strip search? Was it the same as Gonzales or, I'm sorry, Johnson?

A.      Yeah, it was the same as Johnson, squat, cough, lift up my scrotum, bend over by the waist, I spread my butt cheeks. Run my hands through my hair, have the two facial thing, pinky, strip my top lip and my bottom lip, stretch the cheeks in my mouth and show them nothing's there.

(Depo., ECF No. 86-9 at 23-24; 52:19-53:1.)

Q.  Okay. So it was Guzman and Gonzales?

A.  Yes.

Q.  That strip searched you?

A.  No, no, Guzman is the one who initiated the strip search. It was -- he was there, Guzman was there.  It was Gonzales, and I can't remember the other guy's name.  I wrote it down in my --

Q.  Shelton?

A.  Was it -- yeah, yeah, it was Shelton. It was Guzman and Shelton.

Q.  Are you sure?

A.  Yeah, it was Guzman and Shelton. Yeah, I remember it was Guzman and Shelton.

Q.  Okay. So you who did you say initiated the search?

A.  It was Gonzales who initiated it.

Q.  So Gonzales?

A.  Yeah, he was sergeant at the time.  He's the one that gave -- the reason I say he initiated, he's the one that give the authorization for the C/Os to do what they do on the yard, and then his boss is the lieutenant.

Q.  So Gonzales told Guzman to search you?

A.  Yes, he told him and Shelton to search.

Q.  Yes, so they both searched you?

A.  Yes.

(Depo.,  ECF No. 86-9 at 26-27; 55:5-56:5.)

Q.  Okay.  And how long did the search last?

A.  That was about like ten, fifteen minutes.

(Depo.,  ECF No. 86-9 at 27; 56:15-16.)

Thus, according to Plaintiff, the search itself was nearly the same as the search conducted by defendant Johnson the day before, visual only with no touching, conducted by male officers and consistent with the standard procedures for an unclothed body search of any inmate -- running hands through hair, checking the inside of the mouth, viewing around the scrotum, and squatting and coughing.  However, unlike the first search, the second search was

conducted outside on a patio with other inmates and officers, including female officers and nurses, present.

In both Thompson and Michenfelder, the Ninth Circuit has found less private areas to be appropriate locations to conduct strip searches. See Thompson, 111 F.3d at 701 (search was conducted within view of other prisoners on a tier outside inmate's cell); Michenfelder, 860 F.2d at 333 (search was conducted in hallway in view of other prisoners on the same tier and indirectly on video camera by opposite sex prison staff).

The cross-gender nature of a search is a critical consideration. Byrd, 629 F.3d at 1143. It has long been recognized "that the desire to shield one's unclothed figure from the view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity." Id. at 1141 (citing York v. Story, 324 F.2d 450, 455 (9th Cir. 1963) (internal quotation marks and citations omitted)). However, "we cannot assume from the fact that the searches cause immense anguish that they therefore violate protected Fourth Amendment interests. Far from it, our prior case law suggests that prisoners' legitimate expectations of bodily privacy from persons of the opposite sex are extremely limited." Jordan v. Gardner, 986 F.2d 1521, 1524 (9th Cir. 1993) (en banc).

The Ninth Circuit has held that occasional viewing of unclothed male prisoners by female correctional officers does not violate the Fourth and Fourteenth Amendment rights of the inmates. For example, "assigned positions of female guards that require only infrequent and casual observation, or observation at distance, and that are reasonably related to prison needs are not so degrading as to warrant court interference." Michenfelder, 860 F.2d at 334 (citing Grummett v. Rushen, 779 F.2d 491, 494–95 (9th Cir. 1985) (parallel citation omitted)). Courts have also found that strip searches of males may be performed when female staff are present. Michenfelder, 860 F.2d at 334; Grummett, 779 F.2d at 494; see also Jones v. Harrison, 864 F.Supp. 166, 168–69 (D. Kan. 1994). In Somers v. Thurman, 109 F.3d 614, 620, 622 (9th Cir. 1997), the court found that defendants were entitled to qualified immunity because, as of the time of the 1993 searches, male inmates did not have a clearly established Fourth Amendment privacy interest in avoiding visual body cavity searches by female officials. In

both <u>Thompson</u> and <u>Michenfelder</u>, the Ninth Circuit has found less private areas to be appropriate locations to conduct strip searches. <u>See</u> <u>Thompson</u>, 111 F.3d at 701 (search was conducted within view of other prisoners on a tier outside inmate's cell); <u>Michenfelder</u>, 860 F.2d at 330, 333 (search was conducted in hallway in view of other prisoners on the same tier and indirectly on video camera by opposite sex prison staff). <u>Houx v. Koll</u>, No. 115CV00146LJOSABPC, 2018 WL 3129821, at *4 (E.D. Cal. June 22, 2018), but cf. <u>Byrd</u>, 629 F.3d at 1142 (cross-gender strip search that involves touching the inmate's genitalia is unreasonable in non-emergency situations).

Plaintiff testified about the second search, which was conducted in a patio with other people present:

A.      So I start stripping out, and as I'm stripping out, I see female nurses coming out.

(Depo.,  ECF No. 86-9 at 23; 52:1-2.)

Q.      So we'll start with the inmates. How many inmates?

A.      About -- it was about -- it was about 150 people altogether.

(Depo.,  ECF No. 86-9 at 30; 65:15-16.)

Q.      Where were the inmates, the other -- the hundred however many inmates?

A.      They were on this side of the road by Building 1 and 2, the workout bars, restroom and running track.  Then you had the inmates on this side of the road playing handball, playing basketball, running track and by the grass area.

(Depo.,  ECF No. 86-9 at 30; 65:17-23.)

Q.      And what about correctional staff, how many correctional staff were there?

A.      It was J. Gonzales, Guzman, Lozano, I think Lieutenant Marsh, T. Marsh.  He was in the Program Office.  It was about like -- it was about like seven C/Os on the yard.  I don't remember all their names.  It was about -- some of them, it was like my they they're not even on that yard, they're just doing yard time, so they -- they're not going to know what's going on.  So I don't really know those C/Os. Eight altogether including the dude on the tower.

Q.      Were there any female guards?

A.      Well, the only one that I could -- yeah, it was Casa and Ms. Gamboa.

(Depo.,  ECF No. 86-9 at 31; 68:6-19.)

Q.      The search, it occurred -- what was the area called where that search was?

A.    The patio.

Q.    The patio?

A.    Yeah .

Q.    Was there anyone else on the patio?

A.    They had a few inmates on the patio, I don't count them because I'm not -- I didn't file my 602 on them.

(Depo.,  ECF No. 86-9 at 32-33; 70:19-71:1-2.)

Q.    If this case were going to trial that day, what inmates or what witnesses would you call?

A .    I would call Inmate Jesse Williams.

Q.    Where was Jesse Williams?

A.    He was in the chapel.

Q.    So he didn't see the strip search?

A.    No, he seen the C/Os pull me out.

Q.    Okay.  Who else?

A.    Lamar Edison.

Q.    Where was he?

A.    In the chapel. Emanuel Hunt, Inmate Emanuel Hunt, he was in the chapel. And Inmate David Griffin, he was in the chapel.

Q.    Are there any other witnesses?

A.    Those are the ones that agreed to be witnesses if I needed them for my 602 and whatnot, so --

Q.    Were there -- can you identify any of the inmates who saw the search?

A.    I just gave you their names.

Q.    They were in the chapel, though, so they saw you get pulled out of the chapel, but did they see the search also?

A.    I'm pretty sure they seen it, I'm pretty sure they seen - - see, the one thing people have to realize about prison, especially when, like just like a northerner inmate, everyone can be in service or they can be anywhere, where ever they're at.  If a northerner gets pulled out over, a southerner gets pulled out of service, another gets pulled out of service, a black gets pulled out, that race is going to watch what they do, we don't know if we have to run to that person aid.

Q.    How could all four see from inside the chapel?

A.      Look through the window.

(Depo.,  ECF No. 86-9 at 33-35; 71:20-73:6.)

### 3.      <u>Justification</u>

Sergeant Gonzales, C/O Guzman, and C/O Shelton each asserted that Plaintiff's conduct on the morning of May 18, 2014, would have been suspicious and justified an unclothed body search because Plaintiff left his assigned religious service at the chapel twice during approximately twenty minutes to use the restroom located on the 3A Facility yard, when there was a much closer restroom available. As with the May 17, 2014 search, the May 18, 2014 search was also justified because the facility where Plaintiff was housed was a maximum-security facility that was dangerous and required close management, and contraband and drugs were regularly found throughout the facility, including the very restroom Plaintiff used.

Plaintiff described his conduct before the second search took place:

Q.      All right. Mr. Dawson, we're back on the record.  And we were just talking about the May 18, 2014 search, that's at issue.

A .     Yes, sir.

Q.      And you indicated that you went to House of Yahweh Sunday morning service at nine a.m.?

A.      Yes, sir.

Q.      And then what happened?

A.      I had to use the restroom again. So I went to the restroom.

Q.      Was it the same restroom?

A.      Yes, same restroom in the yard. So I went.  Came right back to the building. Well, I  went right back to the service.

Q.      How long I'm sorry to interrupt you.  How long did that take?

A.      Two, three minutes, five minutes at the most.  Me walking there, using the restroom, washing my hands, walking back, about five minutes.

(Depo., ECF No. 86-9 at 19-20; 48:18-49:8.)

Q.      So the first time there was no line, you went to the restroom, was there anyone else there?

///

///

A.   No, there was no one else in line. You have people playing basketball and people working out. The restroom was free. I went straight to the restroom, used the restroom, washed my hands, went straight back to service.

(Depo., ECF No. 86-9 at 20; 49:15-21.)

A.   So about -- no, no, it wasn't exactly twenty minutes, about fifteen minutes later I go back to restroom. This time there's a line. I wait for them to get done using the restroom. I go using the restroom. I go back to service just like I did before the first time, no incident.

(Depo., ECF No. 86-9 at 21; 50: 4-9.)

Q.   And inline is at 10:30?

A.   Yes. So I go back. They pull me out about five minutes later, Guzman and Johnson -- not Johnson, Guzman and Gonzales, Sergeant Gonzales. They tell me, "Out to the patio, Dawson. Step out." "Why? Why am I stepping out?" "Man, step out." Yeah, I stepped out. I'm asking him what's going on. They're like, "Man, strip search. Strip you out." "Like what are you stripping me out for?" "Man, just do what we say, man, just strip out."

(Depo., ECF No. 86-9 at 22; 51: 13-21.)

It is undisputed that a visual search for contraband is a legitimate penological interest. Thompson, 111 F.3d at 700 (citing Michenfelder, 860 F.2d at 332, citing Bell, 441 U.S. at 558–60.) It is also undisputed that the May 18, 2014 search by Defendants was visual, not physical, and there are no allegations to support a finding that the search was excessive, vindictive or harassing. There is no assertion that the search extended beyond a visual cavity search or that Defendants sought to extend the search longer than necessary. Moreover, there are no facts to support a finding that the place of the search -- on the patio -- caused it to be unconstitutional or that any female staff member was there to conduct or participate in the alleged strip searches, or to humiliate or harass Plaintiff.

## C.   **Conclusion**

Based on the foregoing, the court finds that the non-contact visual searches performed by Defendants, with some "casual observation" by female staff members and other inmates during the second search, were reasonable. See Michenfelder, 860 F.2d at 334 (citing Grummett, 779 F.2d at 494–95). Therefore, Defendants' motion for summary judgment should be granted because there are no triable issues of material fact regarding the reasonableness of the alleged strip search, and judgment should be entered in favor of Defendants.

## X.    QUALIFIED IMMUNITY

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." Taylor v. Barkes, --- U.S. ---, 135 S.Ct. 2042, 2044 (June 1, 2015) quoting Reichle v. Howards, 566 U. S. 658, 132 S.Ct. 2088, 2093 (2012).  In resolving the claim of qualified immunity, the Court must determine whether, taken in the light most favorable to Plaintiff, Defendant's conduct violated a constitutional right, and if so, whether the right was clearly established. Saucier v. Katz, 533 U.S. 194, 201 (2001); Mueller v. Auker, 576 F.3d 979, 993 (9th Cir. 2009).  Qualified immunity analysis requires two prongs of inquiry: "(1) whether 'the facts alleged show the official's conduct violated a constitutional right; and (2) if so, whether the right was clearly established' as of the date of the involved events 'in light of the specific context of the case.'" Tarabochia v. Adkins, 766 F.3d 1115, 1121 (9th Cir. 2014) quoting Robinson v. York, 566 F.3d 817, 821 (9th Cir. 2009). These prongs need not be addressed in any particular order.  Pearson v. Callahan, 555 U.S. 223, 129 S.Ct. 808 (2009).

Even if a material issue of fact exists, Defendants are entitled to qualified immunity. Qualified immunity is "immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." Mueller, 576 F.3d at 993 (citation and internal quotations omitted). Qualified immunity shields government officials from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests— the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably," Pearson, 555 U.S. at 231, and it protects "all but the plainly incompetent or those who knowingly violate the law," Malley v. Briggs, 475 U.S. 335, 341 (1986).

The following facts are undisputed: (1) the May 17, 2014 unclothed body search was conducted in a secluded indoor shower area with only two male officers present; (2) the May 18, 2014 search was conducted in a patio area with casual observation by other inmates,

correctional officers, and two female staff members; (3) both searches were visual only, with no touching; (4) shortly before each of the searches, Plaintiff left his assigned religious chapel and walked across the yard to a restroom that was not the closest restroom; (5) inmates at the facility had been found with contraband in the past, and inmates at the facility had used homemade weapons against other inmates; and (6) there are no allegations that would support a finding that either of the searches was excessive, vindictive or harassing. Based on the undisputed facts and the applicable law which allows strip searches, the evidence viewed in the light most favorable to Plaintiff demonstrates that a constitutional violation did not occur, and this ends the analysis. Therefore, Defendants are entitled to qualified immunity.

## XI.    CONCLUSION AND RECOMMENDATIONS

Defendants have submitted evidence that the searches at issue were not unreasonable under the Fourth Amendment.  Plaintiff did not produce any admissible evidence in response to Defendants' evidence that created a disputed issue of material fact for trial.  Accordingly, the court finds that Defendants are entitled to summary judgment on Plaintiff's claims against them, and Defendants Shelton, Guzman, Gonzales, and Johnson's motion for summary judgment, filed on August 30, 2018, should be granted.

Accordingly, based on the foregoing, **IT IS HEREBY RECOMMENDED** that:

1.    Defendants' motion to strike Plaintiff's motion for summary judgment, filed on August 3, 2018, be DENIED;

2.    Defendants' motion for summary judgment, filed on August 30, 2018, be GRANTED;

3.    Judgment be entered in favor of Defendants Shelton, Guzman, Gonzales, and Johnson; and

4.    This case be closed by the Clerk of Court.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within **fourteen (14) days** after the date of service of these findings and recommendations, any party may file written objections with the court.  Such a document should be captioned "Objections to

Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within **ten (10) days** after the date the objections are filed.  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

  Dated:   **November 27, 2018**                        **/s/ Gary S. Austin**
                                         UNITED STATES MAGISTRATE JUDGE